## HOLDEN & A. *v.* LAKE COMPANY.

Estimating damages caused by depriving the plaintiffs of their regular supply of water in the stream.

The rights of riparian owners on a running stream above and below are equal: each has a right to the reasonable use and enjoyment of the water, and each has a right to the natural flow of the stream, subject to such disturbance, and the consequent inconvenience and annoyance as might result to him from a reasonable use of the water by others.

Whether the use and management of the water flowing in a given stream during a given time is reasonable, is a question of fact for the jury to determine, in view of all the circumstances of the case.

CASE, by Benjamin F. Holden and others against Winnipiseogee Lake Cotton & Woollen Manufacturing Co., for disturbing the natural flow of Newfound river, between May 7, 1867, and the date of the writ, September 18, 1870.

1. It appeared that, long before the alleged injury, the defendants had become the owners of the outlet of Newfound lake, and of the shore rights of flowage about said lake, and had deepened the channel at the outlet about three feet, and there erected a dam eight feet high, furnished with gates or sluices whereby they were able to control. to a great extent, in the neighborhood of eight feet of the rise and fall of the water in said lake. At said dam they also erected a saw-mill, having a wheel that drew, during the time covered by the declaration, about seven hundred inches of water.

2. The plaintiffs were the owners of a mill for the manufacture of woollen goods, situated on Newfound river, the outlet of said lake, a short distance above Bristol village; and their alleged injury was that occasioned to their milling interests by the defendants' management of the water. It was claimed by the defendants that they permitted as much water to run in the stream during the dry months of summer as ran there before the improvements, and whether they did so was one question in the case.

3. Much evidence was introduced to show the state of the stream, the amount of water running in it, &c., for a long series of years before the defendants did anything at the outlet. And, subject to the defendants' exception, the plaintiffs were permitted to show how it was, in that respect, after the defendants' operations at the outlet, during many years before the time covered by the declaration; and its condition on particular occasions and under particular circumstances during that time were also shown.

4. Without objection from the defendants, the plaintiffs' witness, Berry, testified to the particulars of an interview had by himself, and several other mill-owners at Bristol, with the defendants' agent French, in which it was arranged that the mill-owners should manage the water at the outlet for a short time by way of experiment, with a view of ascertaining how much water would meet their requirements, and that they accordingly did so for two weeks. On cross-examination, the defendants' counsel asked the witness what offer the defendants at that time made the mill-owners, to settle about the water,—that is, how much water the defendants offered to let them have, to settle. This question was excluded; and the defendants excepted.

5. Upon the question of damages, one of the plaintiffs was permitted to state that the cost of the raw material manufactured at their mill in producing a yard of cloth is about one half the value of a yard of cloth when finished. There was no evidence as to the cost of manu-

facturing a yard of cloth, nor the number of yards manufactured either monthly or otherwise, but only the aggregate amount of business in dollars annually, and the falling off in the aggregate business during the dry months of summer, when the plaintiffs claimed they were injured, as compared with the average of the other months of the year. To this the defendants excepted.

6. The plaintiffs with others broke and entered the defendants' gate-house, and hoisted the defendants' gates at their dam, for which the defendants commenced a suit against the plaintiffs and others. The defendants offered to show by parol that the present suit was not commenced until after the defendants' suit for this trespass. The court excluded the evidence. The defendants then asked their agent, French, whether he directed suits to be commenced for these trespasses before the present suit was commenced. This question was excluded, and the defendants excepted. The defendants claimed that, by operating their saw-mill at the outlet, they only made a reasonable use of the water ; and there was evidence tending to show how said mill was run, and its effect on the flow of the water in the stream. The evidence on the part of the defendants tended to show that the saw-mill was run, most of the time during the summer, from six or half-past six A. M., till six or half-past six P. M., with an intermission of about one hour— from twelve to one. The plaintiffs' evidence tended to show that the water did not get down to them in the morning, so that they could run their mill effectively, until somewhere about eight o'clock in the morning, and that the hour's intermission interrupted them for an hour again in the afternoon. The court instructed the jury that the rights of shore-owners on a running stream above and below were equal ; that each had a right to the reasonable use and enjoyment of the water ; that each had a right to the natural flow of the stream, subject to such disturbance and the consequent inconvenience and annoyance as might result to him from a reasonable use of the water by the others ; that whether the use and management by the defendants of the water flowing from this lake, during the time covered by the declaration, was reasonable, was a question of fact for the jury to determine, in view of all the circumstances laid before them in the evidence. The jury were told that in general the court could not undertake to say, as matter of law, whether a given use was a reasonable use or not ; that in the present case the reasonableness of the defendants' use was a question entirely for them, on which the court could give them little aid.

Several cases were supposed, by way of illustration, of a use very clearly unreasonable, in fact, and the jury were told that in such case they would probably have no difficulty in finding that the uses were unreasonable, and an invasion of the legal rights of other riparian proprietors to a reasonable use. Each example, presenting a use supposed to be unreasonable, was accompanied by another similar in kind, only differing as widely as possible in degree, for the purpose of illustrating a reasonable use. Among the illustrations thus given was the following:

Suppose A becomes the owner of the outlet of a great lake, from which flows a large river, furnishing the power to drive many mills that have been erected on it by owners below; that the dam is of such a character and construction that the owner of it can control the flow of water in the stream; that he shuts down his gates and keeps them closed twelve out of every twenty-four hours, thereby entirely stopping the flow of water in the stream below, and during the other twelve hours raises them so as to allow the accumulated waters of twenty-four hours to escape in twelve, thereby causing an irregular and intermittent flow, so that the water comes down to the proprietors below in instalments or gusts of twelve hours each: I should suppose, in a case of that kind, the jury might not find it a reasonable use. On the other hand, if the structure and location of the dam, and the use made of it, are of such a character as to cause but slight or imperceptible irregularity in the flow of the stream, there probably would be no great difficulty in finding that the use was not unreasonable. To this illustration the defendants excepted.

The defendants requested the court to instruct the jury,—1. The defendants, as mill-owners, have the right to obstruct the water sufficiently to erect a dam, secure a head, and to such reasonable use of the water as will give them the greatest benefit in the proper enjoyment of their right. 2. They have the right to operate a mill of suitable magnitude, adapted and appropriate to the size and capacity of the pond and stream during the whole year, and the quantity of water flowing therefrom or therein, and are not liable for such disturbance or interruption of the water as may be necessary in the reasonable and beneficial enjoyment of their rights as mill-owners. 3. The defendants have the right to detain the water long enough to use it advantageously. 4. They have a right to shut off the water for the purpose of necessary repairs on their mill-dam or works, exercising reasonable care and diligence in making such repairs, or for the purpose of raising their pond to a sufficient height to operate their works, if they are adapted to the size and capacity of their pond and stream. 5. The size of the mill-pond is not material upon the question of the detention of the water during repairs, or for the purpose of securing a suitable and proper head of water. 6. The defendants are not obliged to operate their mill nights, nor let the water escape from their pond nights, when necessary to keep it for the beneficial use of their mill in the daytime.

The court gave the first and second instructions, but declined to give the others, except with qualifications; and the defendants excepted.

The jury were told that it was a question of fact whether what the defendants had done, in the use and management of the water, had, under all the circumstances, prevented a reasonable use by the plaintiffs. Case reserved.

*Pike & Blodgett, Dean, Barnard & Sanborn,* and *Burrows,* for the defendants.

I. The plaintiffs allege, in their writ, that the defendants disturbed

the natural flow of Newfound river, from May 7, 1867, to September 18, 1870; and this was the only question in issue except that of damages. In support of this issue, the plaintiffs were allowed to show the defendants' acts during many years not covered by the declaration; or, in other words, evidence of the defendants' management of the water during a long period outside of the declaration was held to be competent to prove their management of it during another period within the declaration; and specific acts of alleged mismanagement in the one instance were held admissible to prove it in the other. It is evident that this testimony did not correspond with the allegations of the writ, and that it was outside of the point in issue. It concerned collateral facts not connected with the facts in dispute, and furnished no legal presumption against the defendants upon the question on trial, which was as to their management of the water during the time specified in the writ. They were not bound to be prepared to meet testimony as to their management during any other time, and their objection to such testimony should have been sustained. *Wentworth* v. *Smith*, 44 N. H. 419; *Boyce* v. *Cheshire R. R.*, 42 N. H. 383; *Concord R. R.* v. *Greeley*, 23 N. H. 243; *True* v. *Sanborn*, 27 N. H. 383; *Hubbard* v. *Concord*, 35 N. H. 52; *Swamscot Co.* v. *Walker*, 22 N. H. 467; *Mead* v. *Merrill*, 33 N. H. 439; *Keith* v. *Taylor*, 3 Vt. 155; *Phelps* v. *Conant*, 30 Vt. 284; *Graves* v. *Jacobs*, 8 Allen 142; *Collins* v. *Dorchester*, 6 Cush. 398; *Robinson* v. *R. R.*, 7 Gray 92; *Jackson* v. *Smith*, 7 Cowan 717; 1 Greenl. Ev., sec. 52; 2 Cowan & Hill's notes on Phillipps's Ev., p. 451, note 332.

II. Berry having testified to part of the transaction between himself and the other mill-owners with the defendants' agent, it was the defendants' right that the jury should know the whole; and in this view, the inquiry made of the witness on cross-examination was pertinent and admissible. The inquiry did not relate to any offer by the plaintiffs, and it would not seem to lie with them to make the objection on the ground upon which it was based, namely, that it was an offer of compromise.

III. Without showing the number of yards manufactured, either monthly or otherwise, or the cost of the same, the plaintiffs were permitted to state, upon the question of damages, the value of the raw material in a yard of cloth as compared with the manufactured article. This testimony was improperly received, and was only calculated to mislead the jury. It had no legitimate tendency upon the question of damages, or any other question. It could only afford ground for conjecture, because it is plain that there can be no established rule as to the comparative value of the raw material with the manufactured article. This would depend upon circumstances. The market is subject to constant variation, and raw material may be low when cloth is high, or *vice versa.* The relative value of the two articles varies almost daily, and is as changeable as the wind.

IV. The evidence on the part of the defendants showed that they run their saw-mill days, and generally shut off the water nights in order to

obtain a sufficient head to operate their mill beneficially in the daytime; and this they claimed was a reasonable use of their right as mill-owners. In the charge, the jury were told that the court could not say, as matter of law, whether a given use was reasonable or not, and that the reasonableness of the defendants' use was a question entirely for them, on which the court could give them little aid; but yet, the presiding justice proceeded to embody the defendants' precise case in the form of an illustration (see printed case, p. 4), and then gravely told the jury he should suppose, in such a case, they might not find the use a reasonable one! In other words, the judge had nothing to do with the reasonableness of the defendants' use, yet he thought it was unreasonable, and should suppose the jury would think so too! What would be the legitimate and necessary effect of this illustration and expression of opinion upon the jury? One of two results would logically follow: either they must disregard his opinion, or find a verdict against the defendants. Taken in connection with the verdict, it does not require any violent presumption to arrive at the conclusion that the opinion of the court was not discarded by the jury. We claim that, practically, the judge directed a verdict for the plaintiffs, and that the jury merely determined the question of damages. In our view, the illustration of the court was not only improper, but was also necessarily calculated to prejudice the rights of the defendants, and was not demanded by the circumstances of the case. We are aware that it has been held in this state that the judge may make such suggestions upon the evidence as he deems proper. We suppose, however, that this right is subject to limitation, and that the suggestions of the court must be confined to circumstances affecting the credibility of the witnesses or the probabilities of the case, and to the principles and rules by which the evidence is to be weighed and by which the jury are to be governed in finding a verdict. Jurors may as well constitute themselves judges, as for judges to constitute themselves jurors. It makes no difference in the result whether the rights of a party are sacrificed by the one or by the other. The true idea of the respective provinces of courts and juries is expressed in the Massachusetts General Statutes, chap. 115, sec. 5: "The courts shall not charge jurors with respect to matters of fact, but may state the testimony and the law."

V. The last four instructions asked for by the defendants should have been given.

1. The defendants, as mill-owners, have a right to the use of the water, and, as incident to such right, they may detain it long enough to use it advantageously. Angell on Watercourses 117.

2. We submit, as matter of law and from necessity, that they have the right to shut off the water for the purpose of necessary repairs on their mill, dam, or works, exercising reasonable care and diligence in making such repairs, or for the purpose of raising their head to a sufficient height to operate their works, if they are adapted to the size and capacity of their pond and stream. Washburn on Easements, etc. 267–272, and cases cited.

3. The defendants have the same right to secure a suitable head of water in a large pond as in a small one. We do not see how the fact that their mill-pond is large can affect their right to detain the water while making repairs, such as removing and putting in water-wheels, deepening and enlarging wheel-pits, and the like.

4. The last request is sustained by the authorities. See Washburn, before cited, 267–272.

VI. " The jury were told that it was a question of fact whether what the defendants had done, in the use and management of the water, had, under all the circumstances, prevented a reasonable use by the plaintiffs." This, of itself, is not objectionable; but the whole charge is to be construed together. Our ground of complaint is, that the jury were not properly instructed as to the legal rights of the defendants. These rights should have been stated to the jury by the presiding justice, and they should then have been told that the question for them to determine was, whether the defendants had exercised such rights in a reasonable manner or not.

*H. Bingham, Fling, Tappan, Mason & Holden,* for the plaintiffs.

I. The first exception taken by the defendants is as to the plaintiffs' being allowed to show the condition and operation of the water after the defendants' operations at the outlet, and before the time covered by the declaration, etc. It is very plain that it is entirely competent to show the defendants' operations at the outlet upon the water, at any time, as the action was brought and damages claimed on account of the injurious effect and operations of the defendants' work at the outlet, upon the plaintiffs' mill; and any evidence, which would tend to show how the defendants' work at the outlet affected the stream, would be relevant to the question in issue between the parties, and being so was properly admitted. *Boyce* v. *Cheshire R. R.,* 43 N. H. 627; *McKenney* v. *Dingley,* 4 Greenl. 172; *Hawes* v. *Dingley,* 17 Me. 341; *Bridge* v. *Eggleston,* 14 Mass. 244; *Rex* v. *Smith,* 4 C. & P. 411; *Dean* v. *Wellington,* 15 Me. 27; *Trull* v. *True,* 33 Me. 367; Greenl. Ev., vol. 1, sec. 53.

II. The inquiry made of the witness, Berry, by the defendants, on cross-examination, and the evidence sought for by that inquiry, was properly excluded by the court, because it was sought to put in evidence an offer to compromise; and, also, it was an attempt to put in the declaration of a party's own agent in his own favor. Certainly the declarations of an agent are not admissible even against his principal, unless it becomes material to prove the *res gesta,* and such declarations are part of it. *Vide Fairlee* v. *Hastings,* 10 Vesey 123, and authorities there cited. But in this case the *res gesta* itself was inadmissible, because it was an offer to compromise; and the principle of law, which declares that no offer to compromise litigation shall be competent evidence, is well settled. Greenl. Ev., vol. 1, sec. 192; *Cory* v. *Britton,* 4 C. & P. 462; *Healey* v. *Thatcher,* 8 C. & P. 388; *Marsh* v. *Gold,* 2 Pick. 290; *Gerrish* v. *Sweetser,* 4 Pick. 374; *Sanborn* v. *Neilson,* 4 N. H. 501;

Phil Ev. 78, and 2 Phil. Ev. 7; *Downer* v. *Button*, 26 N. H. 338; *Perkins* v. *Concord R. R.*, 44 N. H. 223.

III. The evidence in regard to the value of the raw material in a yard of cloth, as compared with the manufactured article, was properly received, as furnishing an element in calculating the amount of injury received by the mill's not working, when considered in connection with the whole amount of cloth manufactured at the mill. This would certainly afford the means of ascertaining the amount of the work done at the mills, and consequently furnish *data* from which to ascertain the damages which would result from stopping the mills.

IV. The evidence offered by the defendants as to the plaintiffs' breaking open the defendants' gate-house, and as to the time that suits were commenced therefor, was properly excluded, it being wholly immaterial and irrelevant. *Doe* v. *Erskine*, 37 N. H. 316, 327.

V. The instruction of the court to the jury, that it was a question for them whether or not upon the whole the defendants had made a reasonable use of the water, or whether they had not made such an unreasonable use of it as to interfere with the reasonable use of it on the part of the plaintiffs, was right. And the declination of the court to charge, as requested by the defendants, except with qualifications, was also right. *Hays* v. *Waldron*, 44 N. H. 583; *Bassett* v. *Salisbury Mfg. Co.*, 43 N. H. 559; *Snow* v. *Parsons*, 28 Vt. 259; *Merritt* v. *Brinkerhoff*, 17 Johns. 306.

SARGENT, C. J. Whatever change in the outlet of the pond had been made at all by the defendants was made long before the time complained of by the plaintiffs; and the question was, whether such change as was made had operated unfavorably upon the plaintiffs' rights. It was competent to show what was done and how it affected the stream; and that could be done by showing how it was before the change and how afterwards. If the change affected the plaintiffs injuriously, so that they were entitled to recover any damages, then the damages were to be confined to the time limited in the declaration. But it is difficult to see what other rule could have been applied to show what the effect of the alteration was, than by showing the facts before and after the change, and how the change affected the stream and the plaintiffs' rights.

This objection, and also the second, must be overruled. That was a mere offer made to compromise, and not the admission of any independent fact; but the admission of such independent fact, if made, would be for the other side to prove, and not for the party who made it. The plaintiffs had proved a certain arrangement entered into between these parties to try an experiment, and the results of that trial; but that the defendants' offer had nothing to do with that arrangement is apparent. It is too well settled, that such mere offers for compromise are not admissible for either side to show in evidence, to call for a citation of authorities.

The cost of cloth would be made up of the cost of raw materials,

and of the labor expended in the manufacture. The profit, if anything, would be ascertained by deducting from the market value first the costs of material, then the expense of manufacture. But it seems that the expense was not ascertained in that way, nor the profits. When the mill-owner keeps his whole force through the year on full pay, then the amount he manufactures less then the full amount for the year would be so much dead loss, without regard to the profits on a single yard, and the value of the work lost by lack of water would be found by deducting the cost of raw material from the value of the cloth that would have been made with a full supply of water.

To illustrate: suppose the plaintiff keeps twenty hands regularly at work, and to secure their labor he is obliged to pay them so much by the year, whether they work or play. Now, with these twenty hands, with a full supply of water for his machinery, he can make a thousand yards of cloth per day for every full day's work, or fifty yards per hand; and he can sell his cloth, when made, at ten cents per yard. Then his cloth for a week, six thousand yards at ten cents, = six hundred dollars. Now, suppose, one week in August, he is delayed for want of water merely, just half the time, and makes but three thousand yards, which would be worth but three hundred dollars. The product of the week's work would be three hundred dollars less than for a full week; but that is not all loss, for from the full price of the cloth must be taken the cost of the raw material which it would have taken to make the three thousand yards of cloth, which, at the same price as the labor, would be one hundred and fifty dollars for cotton and one hundred and fifty dollars for labor. The cotton is not lost, because it is not used, and the whole amount of the loss to the plaintiff for that week is the one hundred and fifty dollars, which he could have cleared from the labor of his hands, with a full supply of water, more than he did clear, because the water was short. We are unable to see how this evidence was incompetent, with proper instructions, which we are to presume were given.

Nor can we see what the defendants' suit against the plaintiff, or French's instructions concerning suits, had to do with the present suit. The question was not whether the plaintiff and the defendants agreed or disagreed, were friendly or unfriendly. The simple question here was, whether the defendants were liable in this action, and, if so, for how much? It might have been competent, when the plaintiff was upon the stand as a witness, to have asked him concerning his relations towards the defendants, whether friendly or otherwise, and concerning his controversies and suits with the defendants, as bearing upon his state of feeling; and if he did not state his relations with the defendants truly, he might have been contradicted upon that point. But this evidence was not offered with any such view. The testimony here was offered as affirmative testimony, as being competent to bear upon the merits of this case, which it was not, and could not be.

The cases supposed by the court seem to be correct, in principle, so far as they are stated,—at least, we do not discover but that they were;

and the defendants do not find any fault with the supposed case upon that ground, but on the ground that the supposed case was too nearly like the real case they were trying, as shown by the evidence. If the case supposed was correct, then the defendants' misfortune was, that the evidence against the defendants was so plain as to amount to simple demonstration, instead of leaving the point in doubt—not the fault of the supposed case, but of his own testimony. We think the instructions given, and numbered 1 and 2 in the case, were sufficiently favorable to the defendants.

We think it was proper to connect with all the other instructions, as the court did in this case, and to qualify them, by thus connecting with them the question of fact as to whether, by the use of the water by the defendants, as supposed in the proposed instructions, the plaintiffs' rights to a reasonable use of the water would be interfered with. The rights of riparian owners, and owners of mills on the same stream, are so far mutual, and correlative, and interdependent, that an absolute right of one can seldom be established and defined, without reference to the rights of the others. We think there should be

*Judgment on the verdict.*